434 F.2d 1207
 Catherine BODDIE, Lillian Jackson, Thelma Moore and Eldena Kazimer, individually, on behalf of their minor children and all other persons similarly situated, and Jamie Evans, Evelina Privott, Alice Dodge, Lela Esley, as individuals and on behalf of all other persons similarly situated, Plaintiffs-Appellees,
v.
George K. WYMAN, individually and in his capacity as Commissioner of Social Services for the State of New York, and the Department of Social Services for the State of New York, Defendants-Appellants.
 No. 422.
 Docket 35519.
 United States Court of Appeals, Second Circuit.
 Argued November 17, 1970.
 Decided December 9, 1970.
 
 Steven J. Cole, New York City (Louise Lander, Philadelphia, Pa., Henry A. Freedman, Washington, D. C., Dennis B. Schlenker, Albany, N. Y., Robert D. Kolken, Buffalo, N. Y., Richard E. Ellison, Syracuse, N. Y., on the brief), for plaintiffs-appellees.
 Amy Juviler, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., on the brief), for defendants-appellants.
 Before LUMBARD, Chief Judge, HAYS, Circuit Judge and TENNEY, District Judge.*
 HAYS, Circuit Judge.
 
 
 1
 This is an appeal from an order of the United States District Court for the Northern District of New York, granting a preliminary injunction against the enforcement of N.Y. Social Services Law § 131-a (McKinney's Consol. Laws, c. 55 Supp.1970) and the regulations promulgated thereunder, 18 N.Y.C.R.R. § 352.2 (d) (1970). The action was instituted by eight residents of areas of New York state outside New York City who are recipients of that state's federally-supported public assistance programs of Aid to Families with Dependent Children (A FDC) and Aid to the Aged, Blind or Disabled (AABD). Plaintiffs, suing as class representatives of persons receiving AFDC or AABD and of persons who would otherwise be eligible to receive AFDC or AABD, allege that the statutory schedule in § 131-a, which provides for lower monthly recurring grants in 50 upstate counties outside New York City than for the city itself, violates certain mandatory provisions of the Social Security Act, namely, § 402(a) (1), (2), (3) (42 U.S.C. § 602(a) (1), (2), (3) (1964)), and § 1602(a) (1), (2), (3) (42 U.S.C. § 1382(a) (1), (2), (3) (1964)) and regulations promulgated thereunder, as well as the Fourteenth Amendment to the Constitution of the United States. The complaint sought both declaratory and injunctive relief. Originally a statutory three-judge court was convened. That court remanded the federal statutory claim to a single judge. See Rosado v. Wyman, 397 U.S. 397, 403, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).
 
 
 2
 In his opinion granting plaintiffs' motion for a preliminary injunction the district court judge found that there was a "failure of objective support" for the differentials established by the state statute and regulations, that there was a reasonable certainty that plaintiffs would finally prevail on the merits, and that plaintiffs were suffering irreparable harm daily by reason of the differentials. The preliminary injunction enjoins appellants, pending further order of the district court, from enforcing in the 50 upstate counties schedules of grants and allowances in AFDC and AABD programs "other than according to objective, nondiscriminatory standards based upon the cost of the needs of such recipients." The order also requires appellants to promulgate and use schedules for the upstate counties identical to those used in New York City until such time as appellants present evidence which demonstrates that costs are higher in New York City than elsewhere in the state. This court granted a stay. We now affirm the order of the district court and vacate our stay.
 
 
 3
 Section 131-a of the New York Social Services Law establishes schedules for the payment of monthly or semi-monthly regular recurring grants to cover items of basic need such as food, clothing and transportation. The schedules do not include shelter costs which are computed on a different basis and paid as needed. Section 131-a provides:
 
 
 4
 "2. The following schedule of maximum monthly grants and allowances shall be applicable to the social services district of the city of New York:
 
 
 5
 Number of Persons in Household

One Two Three Four Five Six
$84 $134 $179 $231 $284 $329
 
 
 6
 For each additional eligible needy person in the household there shall be an additional allowance of forty-five dollars monthly.
 
 
 7
 3. The following schedule of maximum monthly grants and allowances shall be applicable to all other social services districts:
 
 
 8
 Number of Persons in Household

One Two Three Four Five Six
$66 $111 $156 $201 $246 $282
 
 
 9
 For each additional eligible needy person in the household there shall be an additional allowance of thirty-six dollars monthly."
 
 
 10
 The statute thus allows a maximum disparity of $47 per month in the six member family. With each additional person in the household the amount of the disparity increases.
 
 
 11
 Section 131-a(4)(a) allows the commissioner to raise or lower the levels in a district outside the New York City metropolitan area "if it is established that in such district the total cost of the items included in the schedule applicable to such district actually is more or less, as the case may be, than the cost thereof reflected in such schedule." The commissioner is authorized to increase the level in a district to an amount even greater than the statutory maximums for the upstate area as long as they are not higher than the New York City levels.
 
 
 12
 Pursuant to this statutory authority, the state has promulgated standards of need for various geographical areas which are also levels of maximum payment, since the state purports to pay 100% of need:
 
 
 13
 Family Size
 One Two Three Four Five Six Seven each
 add.
SA-1[1] $84 $134 $179 $231 $284 $329 $374 $45
SA-2[2] $69 $115 $161 $207 $253 $294 $335 $41
SA-3[3] $65 $111 $157 $203 $249 $290 $331 $41
18 N.Y.C.R.R. § 352.2(d) (1970)
 
 
 14
 Thus there are wide disparities in the standards of need and actual payments that are solely dependent upon the place of residence of the recipient within the state. It is plaintiffs' contention that certain provisions of the Social Security Act and the regulations, which must be complied with in order for New York to continue receiving federal funds, do not countenance these disparities in the absence of cost differentials.
 
 
 15
 Titles IV and XVI of the Social Security Act require that a state's plans for Aid to Families with Dependent Children and for Aid to the Aged, Blind, or Disabled must:
 
 
 16
 "(1) provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them;
 
 
 17
 (2) provide for financial participation by the State;
 
 
 18
 (3) either provide for the establishment or designation of a single State agency to administer the plan, or provide for the establishment or designation of a single State agency to supervise the administration of the plan * * *."
 
 
 19
 42 U.S.C. §§ 602(a) (1), (2), (3), 1382 (a) (1), (2), (3) (1964).
 
 
 20
 The existence of arbitrary differences in welfare payments between areas in the same state seems to have been one of the reasons for the enactment of the legislation in its eventual form. The message of the President recommending the legislation noted the often optional nature of state programs at the county level. Message of the President Recommending Legislation on Economic Security, H.R.Doc. No. 81, 74th Cong., 1st Sess. 22 (1935). The Presidential Committee on Economic Security, recognizing that the effectiveness of pension laws would depend largely on broad state involvement, recommended that responsibility for administration of assistance to the aged be centralized within the state to "avoid a diversity of operating standards in the subdivisions within the [s]tate[s]." Social Security Board, Social Security in America, A Summary of Staff Reports of the Committee on Economic Security, 161, 191 (1937). There was a similar situation with respect to aid to needy children. Social Security in America, supra at 234; Douglas, Social Security in the United States 186-87, 192 (1936). These conditions prompted the inclusion in the statute of the requirements of statewide operation, state financial participation and a single state administrative agency. These provisions became part of the program of Aid to the Permanently and Totally Disabled, added to the Act in 1950, Pub.L. No. 734, 64 Stat. 477 (1950), and of the combined program of Aid to the Aged, Blind, or Disabled, enacted in 1962, Pub.L. No. 87-543, 76 Stat. 172, 197 (1962).
 
 
 21
 The regulations enacted by the Department of Health, Education and Welfare, the agency charged with the administration of these federally-supported public assistance programs, also contain the requirements for intrastate uniformity. A state plan for AFDC or AABD must:
 
 
 22
 "Provide that the determination of need and amount of assistance for all applicants and recipients will be made on an objective and equitable basis.
 
 
 23
 * * * Specify a state-wide standard, expressed in money amounts, to be used in determining (a) the need of applicants and recipients and (b) the amount of the assistance payment.
 
 
 24
 * * * Provide that the standard will be uniformly applied throughout the State."
 
 
 25
 (45 C.F.R. § 233.20(a) (1), (2) (1970).)
 
 
 26
 The agency provides in its Department of Health, Education, and Welfare, Handbook of Public Assistance Administration, Pt. II, § 4300 that "State policies, standards and methods will apply equally to persons in like situations wherever they may live" and that "the specific eligibility factors for each assistance program, including resources and standards of need, * * * [must be] uniformly applied in area offices or political subdivisions." Id. Thus, "State and Federal funds [must be] apportioned among the political subdivisions on a basis consistent with equitable treatment of individuals in similar circumstances throughout the State." Id. at § 3200.3.
 
 
 27
 HEW has advised the states that "any variation in cost standards by areas within a State must be justified by facts." Department of Health, Education and Welfare, Simplified Methods for Determining Needs 1 (1964) (G. O. White, ed.).
 
 
 28
 If these administrative regulations and pronouncements are valid, they conclusively support plaintiffs' interpretation of the statutory language.
 
 
 29
 The appellants attempt to rebut this conclusion by arguing that the regulations go beyond the uniformity requirements of the statute itself. Appellants also contend that only the HEW booklet, Simplified Methods for Determining Needs, supra, clearly requires uniform cost standards, and that "this piece of literature is not enforceable in a Court of law." However, the regulations themselves (45 C.F.R. 233.20(a), supra) impose a uniformity requirement, and the promulgation of such regulations is clearly within the power granted to the Secretary of Health, Education and Welfare to "make and publish such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of the functions with which [he] is charged under this chapter." 42 U.S.C. § 1302 (1964). In Lewis v. Martin, 397 U.S. 552, 559, 90 S.Ct. 1282, 1286, 25 L.Ed.2d 561 (1970) the Supreme Court said: "We give HEW the deference due the agency charged with the administration of the Act * * *."
 
 
 30
 It is entirely reasonable for HEW to conclude that uniform standards can best be insured by a single schedule and that departures from such a schedule should be justified by objectively established cost differentials. New York cannot receive federal funds if it continues its system of intrastate differentials unless it can justify such differentials by a showing that they are based on actual differences in cost.
 
 
 31
 Far from supporting the present differentials in payments, the evidence presented to the district court tends to establish the absence of any objective justification for these differentials. The new SA-1 schedule was derived from a modification of the Lower Living Standard of the Bureau of Labor Statistics. See U. S. Department of Labor, Bureau of Labor Statistics, 3 Standards of Living for an Urban Family of Four Persons, Bull. No. 1570-5 (1967). In contrast, the SA-2 and SA-3 schedules were determined on the basis of a 10% increase of figures which had earlier been recommended to the legislature. If appellants had used the same procedures for determining standards throughout the state, a method which is implicit in the requirements of the federal statutes and regulations, the resulting figures for the upstate areas would be identical or substantially identical with those employed in New York City. Indeed, state policy under earlier versions of Section 131 was based on objective data ascertained through a cost study by the Department of Social Services conducted in May, 1968 which showed that the only variation in costs between these areas was due to slight differences in utility rates. Every study undertaken by the Department since then has confirmed the initial conclusion that, with respect to the items covered by the basic grant, that is, food, clothing, personal care, home furnishings, household operations, transportation, education and miscellaneous items, there is no objectively verifiable difference in cost. In a document entitled, "A Report and Recommendations of the New York State Board of Social Welfare and the New York State Department of Social Services to the Governor and the State Legislature concerning Standards of Assistance," November 21, 1969,[4] the reporting agencies concluded that "evidence concerning the cost of living in different regions of the state" indicated that:
 
 
 32
 "The major source of differentials in the cost of living is shelter cost, which is not included in the flat grant. * * The effect of variation in other items of basic need in different regions results in approximately the same total cost of living for households comprised of the same number of persons in all such regions." (Id. at iv.)
 
 
 33
 Based on this determination, the agencies made an express recommendation to the legislature "that there be one statewide schedule of monthly allowances for all basic needs, exclusive of shelter costs." In a memorandum dated June 30, 1970, Commissioner Wyman informed all local social services commissioners that the Department had conducted a price study of the cost of living in different regions of the state which had resulted in the conclusion that prices in those regions "were at least as high as in New York City." In a letter dated August 17, 1970, Commissioner Wyman wrote to the Acting Regional Commissioner of HEW in New York City that the system of different grant schedules in areas of the state was "inconsistent with fair pricing practices."
 
 
 34
 Our affirmance in this case does not, as appellants suggest, place us in the position of arbitrating "the intractable economic, social, and even philosophical problems presented by public welfare assistance programs * * *." Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1163, 25 L.Ed.2d 491 (1970). "`When [federal] money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the states.'" Rosado v. Wyman, 397 U.S. 397, 423, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), quoting Helvering v. Davis, 301 U.S. 619, 645, 57 S.Ct. 904, 81 L.Ed. 1307 (1937). "There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid." King v. Smith, 392 U.S. 309, 333 n. 34, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968). That is the legal principle upon which our action in this case rests.
 
 
 35
 We vacate our stay and affirm the order of the district court.
 
 
 
 Notes:
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 Applicable in New York City and the counties of Dutchess, Greene, Monroe, Nassau, Suffolk, Ulster and Westchester. See Rothstein v. Wyman, 303 F.Supp. 339 (S.D.N.Y.1969) (three-judge court), vacated and remanded, 398 U.S. 275, 90 S.Ct. 1582, 26 L.Ed.2d 218 (1970)
 
 
 [2]
 Applicable in the counties of Albany, Broome, Cayuga, Chemung, Chenango, Clinton, Columbia, Cortland, Delaware, Essex, Franklin, Fulton, Hamilton, Herkimer, Jefferson, Lewis, Livingston, Madison, Montgomery, Oneida, Onandaga, Ontario, Orange, Orleans, Oswego, Otsego, Putnam, Renssellaer, Rockland, St. Lawrence, Saratoga, Schenectady, Schoharie, Schuyler, Seneca, Sullivan, Tioga, Tompkins, Warren, Washington, Wayne and Yates
 
 
 [3]
 Applicable in the counties of Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Steuben and Wyoming
 
 
 [4]
 An Appendix to "Social Services in New York State — The 103rd Annual Report of the New York State Board of Social Welfare and New York State Department of Social Services 1969" (to be published)